UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JIMMY HORACE OAKLEY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-102 |
| | § | |
| L. HUDSON, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this prisoner civil rights action, Plaintiff Jimmy Horace Oakley claims that Defendant Lori Hudson, who worked as a Nurse Practitioner ("NP") at the McConnell Unit in Beeville, Texas, was deliberately indifferent to his serious medical needs following his jaw-wiring surgery, causing him unnecessary pain and suffering in violation of the Eighth Amendment.  NP Hudson has filed a motion for summary judgment to dismiss Plaintiff's claims against her on the grounds that he failed to exhaust his administrative remedies, and in the alternative, that she is entitled to qualified immunity.  (D.E. 47, 61).  Plaintiff has filed a response in opposition.  (D.E. 58, 63).

For the reasons stated herein, it is respectfully recommended that the Court grant summary judgment in favor of Defendant Hudson, and that Plaintiff's claims be dismissed with prejudice.

**I.      Jurisdiction.**

The Court has federal question jurisdiction. *See* 28 U.S.C. § 1331.

## II.      Procedural background.

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), and is currently confined at the Polunsky Unit in Livingston, Texas, although his complaint concerns events that occurred while he was confined at the McConnell Unit in Beeville, Texas, recovering from surgery for a fractured jaw.   Plaintiff filed this lawsuit on April 10, 2013 (D.E. 1), an amended complaint on May 13, 2013 (D.E. 12), and a supplement on May 22, 2013, (D.E. 16) alleging that, on March 25, 2011, while he was at the Connally Unit in Kenedy, Texas, he was assaulted by another offender, LaDaryl Waddleton,[1] who broke Plaintiff's jaw. Plaintiff underwent surgery for his broken jaw at John Sealy Hospital in Galveston, Texas ("Hospital Galveston" or "HG"), and was then sent to the McConnell Unit for post-op care and recovery.   Plaintiff suffered complications following the first surgery, which he attributes in part, to the actions and/or omissions of NP Hudson, necessitating a second surgery.

A *Spears*[2] hearing was held on June 27, 2013, following which, all of Plaintiff's claims were disposed of, save and except his claim of deliberate indifference to his serious medical needs against NP Hudson in her individual capacity.  (*See* D.E. 20).

On August 26, 2013, NP Hudson filed her Answer and raised the defense of qualified immunity. (D.E. 27).

---

[1] In his amended complaint, plaintiff identified Offender Waddleton as a defendant.  (D.E. 12 at 3). However, as explained to Plaintiff Offender Waddleton is a private individual and is not a "state actor" for purposes of § 1983 liability.  *See discussion, Ballard v. Wall*, 413 F.3d 510, 518-19 (5th Cir. 2005). Offender Waddleton was dismissed as a Defendant on July 11, 2013 (D.E. 20).
[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985); *see also Eason v. Holt*, 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a *Spears* hearing is incorporated into the pleadings).

On October 10, 2013, Plaintiff filed a motion for leave to file an amended complaint. (D.E. 34).  On October 22, 2013, Plaintiff's motion for leave to amend his complaint was denied to the extent Plaintiff was attempting to raise claims against his oral surgeons at Hospital Galveston because those allegations raised, at most, claims of negligence or medical malpractice, and not deliberate indifference under the Eighth Amendment.  (*See* D.E. 37).  However, Plaintiff was granted leave to amend and/or supplement his claims against NP Hudson.  *Id.*

On January 10, 2014, NP Hudson filed the instant motion for summary judgment. (D.E. 47).  On March 13, 2014, Plaintiff filed his response in opposition.  (D.E. 58).

On March 21, 2014, Defendant filed her reply to Plaintiff's response (D.E. 61), and on April 14, 2014, Plaintiff filed his supplemental response.  (D.E. 63).

## III.  Summary Judgment evidence.

In support of her summary judgment motion, Defendant Hudson offers:

(1)     Plaintiff's relevant TDCJ medical records (filed under seal);

(2)     Grievance Investigation records (filed under seal);

(3)     Affidavit of Dr. Charles D. Adams, Senior Medical Director for Outpatient Services for the University of Texas Medical Branch, Correctional Managed Care ("UTMB-CMC"); and

(4)     Affidavit of NP Lori Hudson.

(*See* D.E. 47, 48, 49).

The summary judgment evidence establishes the following:

On March 25, 2011, while assigned to the Connally Unit in Kenedy, Texas, Offender Waddleton assaulted plaintiff in D-space, breaking plaintiff's jaw.  (*See* D.E. 16, p. 5).

Following the March 25, 2011 assault, Plaintiff was taken to Hospital Galveston for his injuries, and on March 27, 2011, he was seen by Dr. Haynes, a dentist and oral surgeon.  (D.E. 16, p. 5).  Dr. Haynes told Plaintiff that he would need surgery to realign his jaw.  *Id.*

On March 29, 2011, Plaintiff underwent jaw surgery, and his jaws were wired shut.  (D.E. 16, p. 5).  On April 4, 2011, Plaintiff was released from Hospital Galveston and transported to the McConnell Unit infirmary for post-op care and recovery.  *Id.*  The McConnell Unit is a designated unit for providing 24-hour specialized medical care for inmates following such jaw surgery.  *Id.*

### Evidence of treatment provided April 1, 2011 through August 22, 2011.

On March 31, 2011, Plaintiff was discharged from HG's Oral Surgery specialty clinic after having surgery on his fractured mandible.   (*See* D.E. 49-9. pp. 2-19).  Plaintiff's discharge orders included that he receive a full liquid diet, no strenuous activity, and a follow-up appointment on April 11, 2011 at Hospital Galveston.  *Id.*  at 10.  His discharge medications included an antibiotic, Amoxil, through April 11, 2011, and Peridex 12% rinse to use through April 15, 2011.  *Id.* at  8-10.   For pain, Plaintiff was prescribed Tylenol with Codeine for six days, and Motrin 800 mg, 3 times a day for one month.  *Id.,* p. 6.

On April 1, 2011, Plaintiff was admitted to the in-patient care unit at the at the McConnell Unit infirmary.  (D.E. 49-9, p. 16).  He was seen by NP Husdon that morning. *Id.,* p. 9.  Plaintiff told NP Hudson he was doing "okay."  *Id.,* p. 9.  His lab work was essentially unremarkable.  *Id.,* pp. 9-10.

Nursing notes dated April 2, 2011, indicate that Plaintiff was placed on a liquid diet that he received at breakfast and dinner.  (D.E. 49-9, at 1).  He was encouraged to take in fluids.  *Id.*  Early that morning, Plaintiff was seen by Nurse Gregory complaining of throbbing, level "6" pain on a scale of 1 to 10, and he requested his pain medication.  (D.E. 49-8, p. 42).  Nurse Gregory administered Plaintiff Tylenol #3 and Ibuprofen, and Plaintiff was able to swallow the medication with no acute distress.  *Id.*

On April 3, 2011, Plaintiff was prescribed Pepto bismol tabs for three days.  (D.E. 49-8. P. 39).

On April 4, 2011, Plaintiff was seen by Nurse Gregory complaining of a pain level of "10/10," with throbbing jaw pain to bilateral jaw.  (D.E. 49-8, p. 38).  Upon examination, Nurse Gregory noted that the wires and arch bars of Plaintiff's jaw realignment were intact, and his breathing was equal and unlabored.  *Id.*  Nurse Gregory administered the Tylenol #3 and Ibuprofen.  *Id.*  Also on April 4, 2011, NP Hudson noted that HG's Oral Surgery specialty clinic had failed to enter the follow-up appointment as ordered by Plaintiff's surgeon, and she submitted an expedited referral for a follow-up appointment. (D.E. 49-8, p. 42).[3]

---

[3] According to UTMB practices, the specialty clinic is in charge of ordering any necessary follow-up appointments.  (See D.E. 47-3, pp. 1-7, Affidavit of Dr. Adams @ para. 4).

On April 5, 2011, nursing notes indicate that Plaintiff was "up and about in his room" and that he was medicated with Tylenol #3 for jaw pain with "good effect." (D.E. 49-8, pp. 35-37).

On April 6, 2011, Plaintiff reported to the infirmary for follow-up care. (D.E. 49-8, pp. 33-34). Nurse Miller noted no apparent distress and her assessment was "alteration in comfort." *Id.* at 33. It was noted that he was still receiving a liquid diet and was being encouraged to drink fluids. *Id.* at 34.

On April 7, 2013, Plaintiff saw Nurse Gregory and he complained of throbbing pain with a level of 6 out of 10, and requested his pain medications. (D.E. 49-8, pp. 31-32). Nurse Gregory noted that Plaintiff's jaw wires and arch bars were still intact, and Plaintiff was oriented to time, place and person. *Id.* at 31. Plaintiff was on a liquid diet and had lost fourteen pounds since the procedure. *Id.* Nurse Gregory gave Plaintiff Ibuprofen per orders. *Id.*

On April 11, 2011, Plaintiff was not taken to Hospital Galveston for a follow-up appointment. Notes on April 14 and 15 confirm that Plaintiff was voicing no new complaints, that he was compliant in his treatment, and that he was doing fine. (D.E. 49-8, pp. 10, 12). His wires were intact and he had no complaints of pain. *Id.*, p. 12.

On April 22, 2011, Plaintiff reported a problem in his mouth. (D.E. 49-7, p. 39). He complained that he had noticed bleeding and swelling in the area behind his teeth for approximately the last week. *Id.* Nurse Gregory could not observe the area complained of because Plaintiff's jaw was wired shut, but he observed no obvious swelling or drainage on the outside. *Id.* Plaintiff told Nurse Gregory that he thought he had an

infection.  *Id.*   Nurse Gregory noted that there were no new orders in Plaintiff's file, but that he would follow-up with a provider.  *Id.*

On April 26, 2011, Plaintiff was seen by the McConnell Unit dentist, Dr. Richard Turner, who prescribed an antibiotic.  (D.E. 49-7, pp. 16-17).   Dr. Turner noted that Plaintiff needed to see the oral surgeon for post-operative care.  *Id., p. 16.*   The McConnell Unit nursing staff saw Plaintiff every day that he was prescribed the antibiotic: April 27, 28, 29, 30, 31, and May 1, 2011.  *Id.*, at pp. 4-14.

On May 2, 2011, Plaintiff was seen by Nurse Gregory.  (D.E. 49-7, p. 3).  Nurse Gregory noted there were no new orders, and Plaintiff verbalized no new complaints.  *Id.* Plaintiff was also seen by NP Hudson concerning bleeding along his gums.  (D.E. 49-7, pp. 1-2).   NP Hudson noted that Plaintiff had a laceration to his lower mandible, approximately 1 cm in length, and that it was bleeding freely.  *Id.* at p. 1.  NP Hudson noted the treatment plan as follows:

> Will contact UR [utilization reviewl] to see if we can get patient in to see OR SURG or ENT sooner than scheduled [May 16th] appointment.  Consulted with Dr. Turner, who did not want to see patient but agreed with urgent referral.

(D.R. 49-7, p. 1).

Later that afternoon, Plaintiff requested pain medication.  (D.E. 49-6, pp. 46-47). NP Hudson administered liquid Acetaminophen.  *Id.* at 47.

On May 8, 2011, Nurse Gregory noted that Plaintiff's jaw hardware remained intact.  (D.E. 49-8, p. 30).   Nursing notes indicate he was performing the Peridex Rinse "Swish and Spit" twice a day.  *Id.*

On May 9, 2011, Plaintiff was transported to Hospital Galveston and seen in HG's Oral Surgery specialty clinic.  (*See* D.E. 49-6, pp. 24-27).  Plaintiff had no signs or symptoms of infection and the surgical site had no swelling or drainage; the maxilla-mandibular fixation (hardware) was stable; his sutures were still intact with growth on the lingual (facing the tongue) side of the symphysis fracture area.  (D.E. 47-3, p.3, Adams Af't at ¶ 5).  The doctor could not fully visualize the situation inside Plaintiff's gums because of the limited visibility due to the limited opening of his mouth.  *Id.*  The plan was to have Plaintiff evaluated in one week.  *Id.*

During the time between this appointment and his next follow-up appointment, Plaintiff was evaluated as before by the McConnell Unit infirmary staff on a daily basis.  (D.E. D.E. 49-6, pp. 11-21).  On May 11, 2011, Plaintiff was treated by Dr. Turner who gave him additional Peridex mouth rinse [chlorhexidine gluconate "CHX"]   and prescribed additional antibiotics.  *Id.* at 15-16.

On May 14, 2011, Plaintiff reported to the infirmary requesting pain medication.  (D.E.49-6, pp. 8-10).   NP Hudson ordered the pain medication and entered a note for Plaintiff to be given a soft diet.  *Id.*

On May 16, 2011, Plaintiff was seen at Hospital Galveston again for post-op treatment.  (D.E. 49-5, pp. 53-61).  Plaintiff complained of bumps in his mouth and upon examination, the doctor observed revealed reactive lesions on Plaintiff's outer and inner gums adjacent to tooth #27 (the third tooth from the center on the lower right side).  *Id.* at 54.   Dr. Pampalon opined that treatment would require removal of the lesions and extraction of tooth #27.  *Id.*  Plaintiff agreed to surgery to extract the lesions, but declined

extraction of tooth #27, despite the fact that he was informed refusing to have tooth #27 extracted could result in his condition not improving. *Id.* *(See also* D.E. 47-3, Adams Aff't at ¶ 6).

Following the lesion-extraction surgery, Plaintiff was taken initially to the Darrington Unit, and then returned to the McConnell Unit on June 3, 2011. (D.E. 49-5, p. 24). On June 7, 2011, Plaintiff submitted a Sick Call Request ("SCR") stating that his antibiotics were not working and that his condition was not improving. *Id.* at 19. On June 8, 2011, Plaintiff was seen by Dr. Whitt, the McConnell Unit provider. *Id.* at 18. Upon examination, Dr. Whitt noted Plaintiff's lower right gum area had proud flesh with underlying bits of tooth and bone present, but no purulent drainage. *Id.* Dr. Whitt's assessment was pyrogenic granuloma and she noted that Plaintiff needed a referral back to the Oral Surgery specialty clinic in Galveston. *Id.* Dr. Whitt's notes concluded with "refer to dental within 7 days; start on clindamycin." *Id.*

On June 21, 2011, Plaintiff was seen in the HG Oral Surgery clinic for follow-up. Notes indicate that Plaintiff had refused extraction of tooth #27, and he now had an "obvious infected right parasymphysis fracture and increased bone loss exposing the root of [tooth] #26 to the apex." (D.E. 49-5, p. 1). Notes indicated that Plaintiff had a non-healing infected jaw fracture with bone loss at tooth #26 and #27; that Plaintiff had poor compliance because he refused extraction of tooth #27, and it was now recommended that both teeth #26 and #27 be extracted. *Id.* The proposed plan was to hold Plaintiff over for surgery for removal of teeth # 26 and #27, and to remove and replace the dental hardware and arch bars. *Id.*

Plaintiff underwent a second surgery, and was discharged on June 24, 2011.  (D.E. 49-4, pp. 22-43).

On July 1, 2011, plaintiff was seen by N.P. Hudson.  (D.E. 49-4, p. 14).  Plaintiff complained that he was not getting his antibiotics, and she responded that Plaintiff was incorrect about the discharge orders.  *Id.* However, upon his persistence, N.P. Hudson consulted the discharge orders and determined that Plaintiff was correct.  *Id.* at 13.  Although N.P. Hudson apologized, Plaintiff had gone one week without the antibiotic following the second surgery.

On July 11, 2011, Plaintiff was seen in HG Oral Surgery clinic for a follow-up appointment.  (D.E. 49-16, pp. 21-25).  Nursing notes stated that Plaintiff had no complaints; was tolerating a liquid diet well; had no signs or symptoms of infection; the hardware to secure the fracture was stable; and Plaintiff's sutures were intact without redness.  *Id.*  Plaintiff was experiencing dysesthesia, a neurological condition where touch is unpleasant, on the right side of his face.  *Id.*  The proposed plan of treatment was for Plaintiff to take Tylenol #3 twice a day for fourteen days, to continue the liquid diet and the antibiotic Clinidamycin, and to return to the clinic in two weeks for follow-up care. *Id.*

On July 25, 2011, Plaintiff was seen for a follow-up appointment at the HG Oral Surgery clinic.  (D.E. 49-16, pp. 28-32).  Plaintiff had no complaints and was tolerating the liquid diet well.  *Id.*  He had no signs or symptoms of infection.  *Id.*  His hardware remained stable.  *Id.*  Plaintiff continued to experience dysesthesia on the right side of his lip. *Id.*  The importance of wound care was discussed with Plaintiff.  *Id.*  The plan of care

was for Plaintiff to take Tylenol #3 twice a day for fourteen days, continue with the liquid diet, discontinue the antibiotic, and return in two weeks for hardware release.  *Id.*

On August 9, 2011, Plaintiff was seen in the McConnell Unit for daily follow-up care.  (D.E. 49-16, pp. 33-37).    Plaintiff had no complaints and was tolerating the liquid diet well.  *Id.*  He had no signs or symptoms of infection, and the inter-oral wounds were healed.  *Id.* Plaintiff still had right-side dysesthesia.  *Id.*  Plaintiff was scheduled to return on August 22, 2011 for arch bar removal. *Id.*

On August 22, 2011, Plaintiff returned to HG Oral Surgery clinic for his scheduled appointment.  (D.E. 49-16, pp. 38-41).  Plaintiff had no complaints and was tolerating the liquid diet well.  The arch-bars were removed without complication.  *Id.* The plan was for Plaintiff to return in two months for further evaluation of his dysesthesia.  *Id.*  However, it was noted that the medications that were helpful for dysesthesia, Neurontin and Elavil, were not available in the TDCJ.  *Id.*

On August 24, 2011, Plaintiff was discharged from the McConnell Unit infirmary. (D.E. 49-16, pp. 42-46).

Once at the Connally Unit, Plaintiff complained of jaw pain, and on September 6, 2011, NP Wagner ordered Prednisone, a steroid, for inflammation, and Salsalate, for pain.  (D.E. 49-14, pp. 13-14)  Upon his transfer to the Connally Unit, he was no longer under the care of NP Hudson.

### Condition after leaving the McConnell Unit.

On November 4, 2011, at a Chronic Clinic visit with NP Wagner, Plaintiff complained of jaw pain and numbness from his jaw fracture.  (D.E. 49-14, pp. 22-26).

On December 2, 2011, NP Shollenberger noted that Plaintiff's two month follow-up HG Oral Surgeryclinic appointment never materialized and he submitted a new referral for an appointment.

On December 6, 2011, Plaintiff was seen in the Connally Unit infirmary for complaints of his chronic nerve pain in his lower lip following his jaw surgery. Plaintiff described the sensation as numbness more than pain.  (D.E. 49-14, pp. 30-32).   NP Schollenbarger prescribed Nortriptyline.  *Id.*

On February 27, 2012, Plaintiff was seen for follow-up treatment at the HG Oral Surgery clinic.  Plaintiff related that his dysesthesia on the right side had improved with the use of Nortriptyline, and Plaintiff did not want surgical intervention at that time.  Upon examination, it was noted that there were no signs of infection, and Plaintiff's inter-oral wounds had healed.   Plaintiff's right jaw appeared larger than the left, but the fracture had healed and his x-rays showed good anatomic reduction with the hardware intact.   The plan of care was to continue Plaintiff on Nortriptyline, and to return to the clinic as needed.    Plaintiff declined surgical intervention regarding the right angle of his jaw being larger than the left.

## IV.     Summary judgment standard.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses. *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S.

at 248.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  *Caboni*, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense.  *See Milchalik v. Hermann*, 422 F.3d 252,262 (5th Cir. 2005).  When a government official has pled the defense of qualified immunity, the burden is on the plaintiff to establish that the official's conduct violated clearly established law.  *Id.* Plaintiff cannot rest on his pleadings; instead, he must show a genuine issue of material fact concerning the reasonableness of the official's conduct.  *Bazen v. Hidalgo County,* 246 F.3d 481, 490 (5th Cir. 2001).

## V.     Discussion.

Defendant Hudson moves for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies against her because he failed to file timely his grievances concerning his claims against her, and also argues that she is entitled to qualified immunity to defeat Plaintiff's claims against her.

### A.     Exhaustion.

Defendant Hudson moves for summary judgment to dismiss Plaintiff's claims for failure to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a).  (*See* D.E. 47, pp. 17-20).  The Prison Litigation Reform Act, 42 U.S.C. § 1997e, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional

facility until such administrative remedies as are available are
exhausted.

42 U. S. C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002). Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process. *Booth v. Churner*, 532 U.S. 731, 734 (2001); *Wright v.* Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001). A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints. *Jones v. Bock*, 549 U.S. 199, 215 (2006).

The TDCJ provides a two-step procedure for presenting administrative grievances. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam). The Fifth Circuit requires that both steps be completed in order to file suit in federal court. *Johnson v. Johnson*, 385 F.3d 503, 515-16 (5th Cir. 2004).[4]

---

[4] Step 1 requires the inmate to present an administrative grievance at his unit within fifteen days from the date of the complained-of incident. *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004). The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has ten days to appeal by filing a Step 2 grievance, which is handled at the state level. *Id.*

Defendant Hudson argues that in this case, Plaintiff did not file grievances against her until September 7, 2011, four to six months after the time in which the facts forming the basis of his claims against her arose.  (D.E. 47, p. 19)  She points out that Plaintiff was no longer at the McConnell Unit when he initiated the grievance process.  *Id.*

Defendant's suggestion that Plaintiff's claims arose, for purposes of filing grievances, at the time he first noticed an infection or "bumps" in his mouth in April 2011, and was required to grieve the matter at that time is not supported by case law and is disingenuous.  Indeed, the facts show that Plaintiff attempted to work with the medical staff in resolving his issues.  Despite the secondary infection following the first surgery necessitating extraction of his infected gums, Plaintiff did not file a grievance but attempted to be compliant with his doctors' orders, although he did decline extraction of tooth #27.[5]  Thereafter, in June 2011, the infection was severe and extraction of both teeth #26 and #27 was necessary.  Thereafter, Plaintiff began experiencing dysesthesia in July 2011, and attempts were made to address this condition.   Indeed, the true nature of the complications from the initial jaw surgery were not realized until August 2011 when it became obvious that Plaintiff would continue to experience dysesthesia and that his jaw would be irregular in appearance.  Thus, it was not until August 22, 2011 that Plaintiff truly became aware of his injuries.  He filed his Step 1 grievance on September 7, 2011.  (*See* D.E. 49-14. pp. 39-40).  The grievance was not rejected as untimely.  *Id.* at 40.  In

---

[5] Defendant emphasizes Plaintiff's responsibility in declining the extraction of tooth #27 which arguably led to additional infection.  However, given Plaintiff's experience with the first jaw surgery, his reluctance to have the tooth extracted appears reasonable.  Regardless, his decision did not affect his grievances one way or the other.

the Step 1 grievance, Plaintiff described the history of his jaw surgery and concluded with his complaint that it was now difficult for him to chew and that he was in constant pain.  Plaintiff should not be penalized for waiting to learn of the true outcome of his surgery before filing his grievance.  Thus, it is respectfully recommended that NP Hudson's motion for summary judgment to dismiss Plaintiff's claims for failure to exhaust administrative remedies as untimely be denied.

**B.** **Deliberate indifference and qualified immunity.**

Plaintiff claims that NP Hudson was deliberately indifferent to his serious medical needs while he was housed at the McConnell Unit.  NP Hudson moves for summary judgment on the grounds of qualified immunity.  She argues that there is no genuine issue of a material fact that she was not deliberately indifferent to his serious medical needs, but to the contrary, was proactive and provided appropriate medical treatment to Plaintiff and did not violate his Eighth Amendment rights.  In the alternative, NP Hudson argues that the care she provided to Plaintiff was objectively reasonable such that she is entitled to qualified immunity to bar Plaintiff's claims against her.  *See Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) ("The [qualified immunity] entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.") (emphasis in original).

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982)).   When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).   To discharge this burden, the plaintiff must satisfy a two-prong test."   *Atteberry v .Nocana Gen. Hosp.,* 430 F.3d 245, 251-52 (5th Cir. 2005).   First the plaintiff must claim that the defendants committed a constitutional violation under current law.   *Id.* (citation omitted). Second, the plaintiff must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.   *Id.* While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.   *Pearson*, 555 U.S. at 236 (receding from *Saucier v. Katz*, 533 U.S. 194 (2001)).

### Step 1 – Constitutional violation.

The Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates."   *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation omitted).   A prison official violates this duty when by act or omission he is deliberately indifferent to prison conditions which pose a substantial risk of serious harm. Id. at 834.

In order to state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege the official(s) acted with deliberate indifference to serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 303(1991); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Deliberate indifference encompasses more than mere negligence on the part of prison officials. *Farmer*, 511 U.S. at 837. It requires that prison officials be both aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act. *Id.* Furthermore, negligent medical care does not constitute a valid § 1983 claim. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). *See also Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993) ("[i]t is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim"). As long as prison medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982). Finally, active treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered. *See Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999); *Mendoza*, 989 F.2d at 195; *Varnado*, 920 F.2d at 321. "Deliberate indifference is an "extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). The decision whether to provide additional treatment is "a classic example of a matter for medical judgment." *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir. 2006).

Plaintiff claims that NP Hudson was deliberately indifferent to his serious medical needs because she: (1) failed to schedule his return to the HG Oral Surgery clinic on April 11, 2011; (2) failed to provide him with dental necessities, such as tooth powder and wax; and (3) failed to provide him with appropriate post-op treatment.  Plaintiff's medical records belie these allegations.

First, as to the scheduling issue, there is no dispute that, following his March 29, 2011 jaw-wiring surgery, Plaintiff's oral surgeon ordered that Plaintiff return for a follow-up visit on April 11, 2011.  Although the follow-up visit was ordered by the doctor, it was the responsibility of the HG Oral Surgery clinic to actually *make* the appointment.  In his unrefuted affidavit, Dr. Adams testifies:

> NP Hudson took measures to ensure Mr. Oakley was seen by HG's Oral Surgery clinic when a follow-up appointment was not scheduled by HG.   NP Hudson subsequently called utilization review to have Mr. Oakley's appointment moved up when she had concerns about his medical condition.

(D.E. 47-7, Adams Aff't at ¶16).  Indeed, it was NP Hudson who discovered that a follow-up appointment had been ordered but not scheduled, and she took it upon herself to submit a referral request to get the appointment.  She obtained a May 16, 2011 appointment; however, based on Plaintiff's complaints of pain and fear of infection, she requested that the appointment be moved to a sooner date, and it was moved to May 9, 2011. *Id.*

Plaintiff complains that NP Hudson refused to provide him with medical necessities such as a toothbrush, tooth powder, floss, or dental wax, despite his repeated requests for these items.  Again, Dr. Adams notes:

> I understand that the Plaintiff has claimed his infection was caused in whole or in part because NP Hudson did not provide him with a tooth brush, tooth powder, floss, or dental wax despite his requests.  Floss is not indicated for patients who have undergone the treatment Mr. Oakley went for his jaw.  Dental wax is sometimes used to provide comfort if the wires are irritating the insides of the cheek.  Providing wax in a correctional setting would typically need to be approved by the unit wardens because of security issues such as duplicating a key.  I have not noted any indication in the medical records that Mr. Oakley requested wax or that this treatment was indicated.  Finally, a toothbrush and "tooth powder" are "necessities" that are provided by TDCJ security staff without the involvement of medical staff.  For a patient with a wired jaw, the tooth brush is partially effective and can be used only to brush the outside of the teeth.  Because dental hygiene is more difficult during this time, Peridex mouth rinse is prescribed for daily use for oral hygiene and to prevent infection.   Because Mr. Oakley was prescribed and issued Peridex, I do not see any indication NP Hudson was deliberately indifferent to an infection in Mr. Oakley's mouth.

(D.E. 47-3, p. 6, Adams Aff't at ¶ 19).

Plaintiff's medical records demonstrates that he was provided Peridex and assited in perfoming the swish and spit routine twice daily.

Finally, Plaintiff claims that he was ignored by NP Hudson; however, his medical records squarely refute this allegation.  Plaintiff **lived** in the McConnell Unit infirmary following his surgery, until he was transferred off the unit.  He was under the infirmary's care 24 hours a day, every day he was at the McConnell Unit.  He received his liquid diet, medications, and daily progress was noted.   He saw someone from the medical department at least once a day, if not more frequently, and his condition was monitored. In her own affidavit, NP Hudson testifies:

> At no time did I ever have any knowledge or belief that Mr. Oakley had any medical conditions that were not being addressed by myself or other members of the medical staff.  At no time did I refuse any treatments to Mr. Oakley believing treatment was necessary or that there was a serious risk to his health or safety.  At all times I attempted to enter orders accurately and to follow a plan of care prescribed by the oral surgeons following surgery.  In my review of Mr. Oakley's records I see that I and other medical providers prescribed him a number of different medications to treat his condition and to manage his pain, and provided near daily evaluations while he received inpatient care at the McConnell Unit infirmary.

(D.E. 47-4, pp. 2-3, Hudson Aff't at ¶ 4).

The fact that Plaintiff developed a secondary infection following his March 29, 2011 jaw surgery is unfortunate.  However, there is no evidence that the almost one month delay in returning to Hospital Galveston for follow-up care (from the ordered but unscheduled April 11, 2011 appointment to the expedited May 9, 2011 appointment) caused the infection.  Indeed, Plaintiff saw the McConnell unit dentist and was prescribed a second round of antibiotics.  Had he gone to HG sooner, there is no evidence that the recommended treatment then, as it was in May, would be to extract tooth #27, a procedure Plaintiff was unwilling to undergo at that time.  Deliberate indifference may not be predicated on negligence or a "failure to alleviate a risk that [NP Hudson] should have perceived but did not."  *Domino*, 239 F.3d at 756

### Step 2 – Objective reasonableness.

Because Plaintiff has failed to state a constitutional violation as to NP Hudson, the Court need not examine whether Defendant Hudson's actions were reasonable.  *See Saucier*, 533 U.S. at 201 (if the facts alleged do not establish that the officer's conduct

violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate).  Thus, it is respectfully recommended that NP Hudson be granted summary judgment in her favor as to plaintiff's §1983 claims of deliberate indifference and those claims be dismissed with prejudice.

**VI.     Recommendation.**

There is no genuine issue of a material fact that NP Hudson was not deliberately indifferent to Plaintiff's serious medical needs.  Thus, it is respectfully recommended that NP Hudson's motion for summary judgment (D.E. 47) be granted in her favor, and that Plaintiff's claims be dismissed with prejudice.

Respectfully submitted this 24th day of June, 2014.


B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).